UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:15-CR-00168 (AWT) |
| | : | |
| v. | : | |
| | : | |
| ALEJANDRINO DEJESUS | : | October 31, 2016 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in connection with the sentencing of defendant Alejandro DeJesus ("DeJesus" or "Defendant"), which is currently scheduled for November 7, 2016.   As set forth below, the Court should impose a sentence within the recommended Guideline range.

**Background**

I.   **Case Background**

In 2012, members of the DEA's New Haven District Office's Tactical Diversion Squad began an investigation into a Drug Trafficking Organization ("DTO") that manufactured fraudulent prescriptions for oxycodone and distributed oxycodone in the greater New Haven, Connecticut area.   Members of the DTO obtained the personal identifying information (*i.e.*, name, DEA registration number, address etc.) of the medical practitioners necessary to create the fraudulent prescriptions in a variety of ways, including by purchasing legitimate prescriptions from numerous individuals.   They then used "runners" – individuals who were either looking for easy money or oxycodone to support their own addictions – to fill the fraudulent prescriptions at pharmacies throughout Connecticut.   Once a runner provided his or her personal information

1

(*i.e.*, name, date of birth, and driver's license number) to a DTO member, the runner's information was kept on file and often used to create other fraudulent prescriptions.

The runners employed by the conspiracy almost always held state-sponsored medical insurance (*i.e.*, HUSKY) and, consequently, DTO members almost always acquired the oxycodone pills on Medicaid's tab, at no cost to them.   DTO members then sold the oxycodone, typically obtained in 30mg tablet form, for prices ranging to $20 to $30 per pill.

From February 1, 2013 through September 10, 2015, the DTO stole the personal identifying information of over 50 doctors and medical professionals and diverted over 80,000 oxycodone pills.   Agents identified over 800 fraudulent prescriptions passed by members of the DTO using over 270 different "patient" names.

## II.   Defendant DeJesus' Role in the Conspiracy

Multiple individuals have identified DeJesus as a key member of the DTO.   A cooperating witness ("CW-1") indicated that DeJesus, known to him as "Boo," worked closely with defendant Julian Cintron to recruit and transport runners to fill fake oxycodone prescriptions.   In post-arrest interviews, several runners reported filling fraudulent prescriptions for DeJesus.   For example, a runner with the initials R.S. identified DeJesus as the person who provided him with the fraudulent prescription he was arrested for filling on October 12, 2014. In addition, a runner with the initials A.C. identified DeJesus as the person who accompanied Cintron when Cintron used a blue Acura (DeJesus' vehicle) to take her to fill fraudulent prescriptions.

A number of other cooperating witnesses and confidential informants have provided extensive information concerning DeJesus' role in the conspiracy.   Two cooperating witnesses

2

("CW-2 and CW-3") would have testified at trial that DeJesus paid CW-3 to print fraudulent

prescriptions, which CW-3 delivered to DeJesus at his mother's house.   Both CW-2 and CW-3

also would have testified that they purchased heroin from DeJesus on numerous occasions;

CW-3 purchased oxycodone from DeJesus as well.   A fourth cooperating witness ("CW-4")

would have testified that DeJesus purchased oxycodone from Cintron on occasion, and was a

regular distributor of oxycodone, heroin and cocaine.   CW-4 would have testified that DeJesus

stored drugs in his home, and that he personally observed DeJesus retrieve drugs from his home

on at least one occasion.   A fifth cooperating witness ("CW-5") would have testified that, on

several occasions, he sold to DeJesus bulk quantities of oxycodone which he (CW-5) obtained

through the filling of fraudulent prescriptions.

Finally, a confidential informant ("CS-3")[1] advised law enforcement that DeJesus worked

closely with Cintron and David Thompson.   According to CS-3, DeJesus was in the car with

Thompson when he drove a runner with the initials C.M. to attempt to fill a fraudulent

prescription in Waterbury, Connecticut on March 18, 2015.   CS-3 stated that the patient number

listed on the prescription actually belonged to DeJesus, and that the pharmacist called DeJesus in

an attempt to confirm the legitimacy of the prescription.

On August 22, 2015, CS-3 advised law enforcement that he had recently seen an entire

pad of prescriptions belonging to a doctor with a last name starting with "V" who worked on

Prince Street in New Haven – subsequently identified by agents to be Dr. Vornovitsky of Prince

Street, New Haven – in DeJesus' possession inside his vehicle.   Agents subsequently

---

[1] To avoid confusion, confidential sources are referenced herein by the same numbers assigned to them in the Master Affidavit supporting the arrest warrants and criminal complaints issued on September 8, 2015.

determined that several fake prescriptions purporting to have been written by Dr. Vornovitsky were filled on August 22, 2015.

The information provided by CS-3 on August 22, 2015 was corroborated by agents who conducted surveillance of DeJesus on that date.   At approximately 4:08 p.m. on August 22, 2015, agents established surveillance of DeJesus in the area of Blue Hills Avenue and Tower Avenue in Hartford, Connecticut, where they located DeJesus driving his blue Acura on Tower Avenue.   Agents located a CVS Pharmacy nearby on Blue Hills Avenue.   When agents entered the pharmacy, they saw a black male subsequently identified as a runner with the initials K.H. sitting by the pharmacy counter.   At approximately 4:35 p.m., agents observed K.H.   exiting the pharmacy with a plastic CVS bag in his hand.   Agents followed K.H. to Salisbury Street, where they observed him getting into DeJesus' vehicle.   Agents subsequently determined that K.H. filled a prescription for 120 oxycodone 30m tablets purporting to be to a patient named Marta Lopez by Dr. Vornovitsky at the CVS.   K.H.'s name and driver's license number were written on the prescription, which was time-stamped 4:22 p.m.[2]

After surveilling K.H. at the CVS Pharmacy on Blue Hills Avenue, agents followed DeJesus' vehicle to three additional pharmacies: a CVS Pharmacy located at 556 Farmington Avenue in Hartford, a CVS Pharmacy located at 150 South Main Street in West Hartford and a Walgreens Pharmacy located at 540 Bushy Hill Road in Simsbury, Connecticut.   It did not appear that K.H. successfully passed prescriptions at any of these locations.

In addition to his role recruiting and transporting runners for the DTO and redistributing

---

[2] Agents recovered a fake Dr. Vornovitsky prescription that had been ripped up and discarded by David Thompson while under surveillance on August 31, 2015.

oxycodone acquired by the DTO, DeJesus is a known trafficker of heroin and cocaine.

    1.    **August 21, 2015 Controlled Buy**

On August 21, 2015, the DEA arranged for a confidential source ("CS-5") to attempt to purchase cocaine and heroin from DeJesus in New Haven, Connecticut utilizing $600.00 of DEA serialized buy money.   At approximately 2:00 p.m., agents transported CS-5 to the area of Grand Avenue.   While driving in the area, agents observed DeJesus in his blue Acura in the company of an unknown female. Agents then provided CS-5 with $600.00 of serialized buy money in order to purchase two eight balls of cocaine (approximately seven grams) and three grams of heroin.   CS-5 was outfitted with two recording devices, including one that transmitted.

At approximately 2:10 p.m., agents observed CS-5 standing next to the blue Acura speaking to DeJesus.   Agents overheard part of this conversation while monitoring the transmitter.   CS-5 was seen getting into DeJesus' vehicle for a moment and could be heard placing the order for cocaine and heroin and providing DeJesus with his phone number to be reached at once DeJesus could make the deal.   CS-5 exited DeJesus' vehicle after placing the order.

At approximately 2:16 p.m., agents observed DeJesus traveling on Grand Avenue, towards Ferry Street and followed him back to his apartment at 45 Donna Drive.   At approximately 2:23 p.m., agents observed a Hispanic male wearing jeans and a red shirt walking around DeJesus' vehicle.   At approximately 2:30p.m., agents observed DeJesus exit his apartment building holding his baby.   DeJesus was accompanied by a Hispanic female, light skinned, wearing scrubs.   The unknown Hispanic male in the red shirt approached DeJesus as he was walking to his car.   DeJesus was seen placing the child in the rear driver's side of his car,

while the female went to the trunk of the vehicle.   The male in the red shirt then got into the front passenger seat of DeJesus' car, while DeJesus got into the driver's seat.   Approximately one minute later, the male in the red shirt exited and walked away.

At approximately 6:07 p.m., CS-5 received a call from DeJesus.   Agents overheard DeJesus ask CS-5 what he wanted.   CS-5 replied, "2 yay and 3 D." Agents understood this to mean two grams of cocaine, and three grams of heroin.   At approximately 6:29 p.m., CS-5 received a second call from DeJesus, who asked CS-5 where he wanted to him to meet him.   CS-5 requested the area of Grand Avenue and East Pearl Street.   At approximately 6:32p.m., CS-5 was dropped off in the area of Grand Avenue and East Pearl Street.   CS-5 was equipped with one recording device and one transmitting device.

At approximately 6:49 p.m., agents received a call from CS-5 indicated the deal was completed and DeJesus was leaving the area in the back seat of a brown Toyota Venza, which was being operated by a Spanish male.   Agents advised surveillance units the deal was completed and to be on the lookout for the vehicle in question.   Shortly after the deal, a brown Toyota Venza was seen on Howard Avenue in the area of 75 3rd Street, New Haven, Connecticut, which is where DeJesus' mother resides.

CS-5 then met with agents at a pre-arranged meet location and relinquished custody of two plastic baggies containing a white powder substance, and three smaller plastic baggies containing an off-white/brownish powder substance, which he stated that he purchased from DeJesus in exchange for $600.   The substances field tested positive for cocaine and heroin, respectively.   CS-5 also relinquished custody of the recording device and transmitting device.

2.      **August 27, 2015 Controlled Buy**

On August 27, 2015, the DEA arranged for CS-5 to attempt to purchase five grams of heroin from DeJesus using $400 in DEA serialized buy money.   At approximately 1:00 p.m., while in the presence of agents, CS-5 placed a call to DeJesus and arranged to purchase five grams of heroin for $400.00.   The location for the deal was set for the area of Asylum Street and Sylvan Street in New Haven, Connecticut.   Prior to the deal, CS-5 received an incoming call from DeJesus letting CS-5 know he was on the way.   At approximately 1:45 p.m., surveillance was established and observed a silver Ford Explorer with Connecticut registration 470YES, registered to DeJesus, arrive at the meet location.   CS-5 was observed getting into the Ford Explorer and the conversation was monitored.

Once the deal was completed at approximately 1:50 p.m., CS-5 met with agents and relinquished custody of a substance suspected to be heroin and audio recording devices.   CS-5 reported that DeJesus, who was the passenger in the front seat of the vehicle, sold him dive grams of heroin in exchange for $400.   Surveillance units then followed the Explorer and recognized DeJesus as the front seat passenger.   After making a brief stop, consistent with another narcotics transaction, the Explorer with DeJesus returned to 45 Donna Drive.

3.    **DeJesus' Flight from Arrest and Destruction of Evidence**

In the early morning hours of September 10, 2016, when agents showed up at 45 Donna Drive to arrest DeJesus and execute a search warrant at his home, DeJesus was not there. Officers were unable to locate DeJesus for a period of approximately 18 hours, at which time DeJesus turned himself in DeJesus – but without a cell phone or any other contraband.   Agents did not recover any evidence from DeJesus' home, despite CW-4's credible statements

indicating that DeJesus stored narcotics at his residence.

DeJesus claims in his sentencing memo that it was only by "chance" that he was not home at 6 a.m. on September 10, when agents showed up to arrest him and search his home. (Docket No. 414 at 6.)   A recorded prison call intercepted on September 22, 2016, following DeJesus' arrest, indicates otherwise.   Specifically, a September 22 call between DeJesus and his girlfriend, Deanna Britton, suggests that the reason agents located no evidence in his home at the time the search warrant was executed was because someone tipped off DeJesus to his impending arrest, leading him to flee and "clean out" his "crib" prior to the agents' arrival.   The September 22 call between DeJesus and Britton proceeded, in relevant part, as follows:

> DEJESUS: (clearing throat) I asked you if you wanted me to run Deanna. I asked you. But I was gonna get caught one day Deanna…One day I was getting caught, you know.
>
> BRITTON: (crying) I just could never forget the day they came.
>
> …
>
> DEJESUS: Sorry. Sorry for leaving you there babe. But I told you to come on. I told you man. I told you…
>
> BRITTON: But you left.
>
> DEJESUS: I left because you arguing Deanna. You keep telling me I'm lying. You keep telling me I was crazy. That's why I left. You kept arguing with me and then you say you just looking for an excuse to be out. Like, I wasn't…Now you believe me I wasn't (inaudible)?
>
> BRITTON: But you coulda. But you coulda dropped me off at my mother house where I said I wanted to go.
> …
> DEJESUS: Cause you not understandin me. I keep tryin to tell you something Deanna. I tell you cause its fact. I talk to (inaudible). When you gonna understand me. When you gonna believe me Deanna. When I tell you I don't lie to you. I've never in my life lied to you Deanna. I don't need to lie.

BRITTON: Because I wanted you to drop me off at my mother house.

DEJESUS: Well. You not understanding me. You not listening. That's not what you was doin Deanna. That's not what you was doing. You was fightin with me. You was arguin.
BRITTON: Because I wanted to go.

DEJESUS: (inaudible) And then you say pick me up I wanna go to my mother house. You know you fightin with me Deanna. If you woulda been from the beginning, then bae what are we gonna do. Even Joel was saying, yo why don't you stay over here and I'll go over to my moms. But no, you was arguing with me. You wasn't even listenin to him.[3]

BRITTON: (inaudible)

DEJESUS: (inaudible) **asked and been like, alright, if they comin what are we gonna do? I don't want to be here. Let's go together. But you wasn't saying that. You, you was fightin with me and thinkin like I wanna be out on the streets. I didn't want to be out on the street.**

BRITTON: Because you just jumped in the car and left.

DEJESUS: Because Deanna, you not listenin to me. I told you this dog. I told you before I even went to pick you up, I told you what was going (inaudible). **You didn't believe me. You wasn't listenin to me. I cleared out the crib and everything. You, you, you thinking like it was a game. Like I just wanted to be out with Joel. Like I was just looking for an excuse to be out.** Like you know...that gets me mad because since day one when I been with you Deanna, I tell you nothin but facts. I tell you the truth. I don't need to lie to you. You're my woman. You're my everything. You're all I wanted. You're all I have. You're my sons mother. Like I don't need to lie, I don't need to cheat, I don't need to do any of that. Yea I was getting high. Fuck it. You know. But I was movin around to support our habit. I don't need to lie to you and that's what was botherin me. (inaudible) **Ask Joel. That night I didn't sleep. And then the morning when that happened it broke me down. I had like a nervous breakdown. Me telling him like damn I can't believe I fucking left her, I should have took her with us. You know and all he kept saying was I told you you should of stood in the house over there by yourself. I told you. I told you. But regardless bae they woulda found us.** If you woulda stood with me they woulda found the car over there and found…they probably woulda heard the baby crying upstairs at Joel's house. I don't know…It don't matter. The car had a tracking device that's how they found the car.

---

3 "Joel" refers to Joseph Palumbo, an unindicted co-conspirator with whom DeJesus was driving on the date that he fled from officers.   Palumbo died of a heroin overdose on or around October 21, 2016.

(Emphasis added).

The Government believes that, in this call, DeJesus was telling Britton that, on the evening of September 9 or early morning hours of September 10, he told Britton that officers were coming to their home to arrest him, asked Britton if she wanted him to "run," and "cleared out the crib" of incriminating evidence in anticipation of the law enforcement's arrival.   DeJesus expressed frustration at Britton – who apparently thought DeJesus was making excuses to leave their home to stay out with a friend ("Joel") – for not believing him when he told her that agents were coming to arrest him, and went on to express regret for leaving her behind when he fled. In light of this conversation, the Government believes that the reason agents did not locate narcotics or any other incriminating evidence when they executed a search warrant at DeJesus' home on September 10 was because DeJesus had removed the evidence ("cleared out the crib") before he fled and before the agents arrived on the scene.

### 4.  DeJesus' Threats of Violence Against Confidential Informant

Additional recorded calls indicate that DeJesus identified the individual whom he believed to have purchased heroin from him on August 21 and 27, 2015, and threatened violence against that individual from prison.   Specifically, on September 26, 2016, DeJesus made a phone call to his sister, and asked his sister to put her boyfriend, named Carlos, on the phone. When a male (believed to be Carlos) came to the phone, DeJesus stated that he believed a person by the name "Ivan" snitched on him.   The conversation then continued as follows:

DEJESUS:     I need you to talk to Gordo ... and I need you tomorrow
please (pause) .. just read between these lines bro ... my brother Alex ... right ... Josh

CARLOS:     yup

DEJESUS:      Alex

CARLOS:       yup, yup

DEJESUS:      tell him that I need him to go ASAP with pop dukes to the south ...

CARLOS:       [Incomprehensible}

DEJESUS:      alright ... tell him don't ask questions ...

CARLOS:       yup

DEJESUS:      just go over there with that ... to please ...

CARLOS:       alright

DEJESUS:      to listen please if there's one thing I want him to do is go on vacation with pops tell him ...

CARLOS:       alright

DEJESUS:      and then later in life, eh, eh, eh, you know

CARLOS:       I heard you.

DEJESUS:      [incomprehensible] right whatever you know ... [incomprehensible]

CARLOS:       sounds like that

DEJESUS:      alright put Jessie I love you papito

CARLOS:       I love you too

DEJESUS:      please be safe, take care, you know handle bro ...

CARLOS:       always, yea always

DEJESUS:      be careful

Agents interpreted this conversation to be an instruction by DeJesus to Carlos to contact

"Alex," an individual whom officers know to have a brother named Josh ("Just read between

these lines bro…my brother Alex…right…Josh"), and direct Alex to meet with "Pop Dukes," an individual also known to law enforcement.   Agents believe that DeJesus wanted Alex to order Pop Dukes to bring harm to Ivan as retaliation for Ivan "snitching" on DeJesus. ("Tell him [Alex] that I need him [Ivan] to go ASAP with pop dukes to the south / Alright…tell him don't ask questions / If there's one thing I want him to do is go on vacation with pops…").   As a result of this conversation, agents placed the individual to whom DeJesus referred as "Ivan" in protective custody, where he remained for a period of months until agents believed that the threat had dissipated.

## III.   Procedural history

On September 20, 2016, a grand jury sitting in New Haven indicted DeJesus with Conspiracy to Possess with Intent to Distribute and Distribution of Oxycodone in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846 (Count One), Conspiracy to Acquire Oxycodone by Fraud or Forgery in violation of 21 U.S.C. §§ 843(a)(3) and 846 (Count Two) and Possession with Intent to Distribute and Distribution of Oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Five and Six).   On February 19, 2016 a grand jury sitting in New Haven returned a Superseding Indictment against DeJesus.   On March 22, 2016, a grand jury sitting in New Haven returned a Second Superseding Indictment against DeJesus.   The First and Second Superseding Indictments added defendants to the charged conspiracy, but the substantive counts against DeJesus were unchanged.

On August 5, 2016, DeJesus pleaded guilty to the conspiracy charge contained in Count One of the Second Superseding Indictment.   The parties agreed in their plea agreement that: (1) the defendant fell within Criminal History Category V, (2) the defendant's base offense level was

12

32, based upon a stipulated quantity of not less than 15,000 oxycodone 30 mg tablets, (3) three levels would be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in an adjusted offense level of 29.   The parties further agreed that DeJesus would be permitted to argue at sentencing that a Criminal History Category V overstated his criminal record under U.S.S.G. § based on three points accumulate for a 1996 sale of narcotics conviction, and that the Government would not object to such a departure.   The parties further agreed that a total offense level of 29 in Criminal History Category IV resulted in a Guideline range of imprisonment of 121 to 151 months, a fine range of $30,000 to $1,000,000 and a term of supervised release of three years to life.

## III.    The Presentence Report

On September 16, 2016, the Probation Department issued a Presentence Report ("PSR") that found the defendant's applicable base offense level, under Chapter Three of the Sentencing Guidelines, to be a level 32.   PSR ¶¶ 32.   Probation applied a four-level enhancement for DeJesus' role in the offense, in light of the fact that DeJesus recruited and paid multiple runners to work for him.   PSR ¶¶ 35.   With the four-level role enhancement, Probation calculated DeJesus' adjusted offense level to be a level 36.   PSR ¶ 35.   The PSR also subtracted three levels, under § 3E1.1(a), for acceptance of responsibility, resulting in a total offense level of 33.   PSR ¶¶ 38-40.   Finally, the PSR concluded that the defendant fell within Criminal History Category V. PSR ¶ 51.   As a result, the PSR calculated the advisory Guideline range to be 210 to 262 months' imprisonment.   PSR ¶ 83.

With respect to factors that might warrant departure from the Guideline range, the PSR noted only that the Court might wish to make a departure under *U.S. v. Fernandez* in light of the parties' plea agreement, which contemplated a lower Guideline range of 140 to 175 months.

13

PSR ¶ 99.[4]   The PSR did not identify any other facts that would warrant a downward departure or non-Guidelines sentence.

**Argument**

**The Guideline Range Set Forth in the Presentence Report**
**Is a Reasonable Sentence in Light of the Sentencing Factors**

Although application of the United States Sentencing Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), in each case, "the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)" in arriving at a reasonable sentence.   *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements.").   Thus, the sentencing court must now first determine the applicable Guidelines range (including any departures), and thereafter, determine whether in light of the Guidelines and the other factors listed in section 3553(a), there is any reason to impose a non-Guidelines sentence.   As the Second Circuit explained, "*Booker*/*Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *Crosby*, 397 F.3d at 113.   Both the Supreme Court and the Court of Appeals expect "sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a), . . . and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving

---

[4] The Government does not object to a *Fernandez* departure in this case in order to give effect to the parties' plea agreement.

somewhat more individualized justice."   *Crosby*, 397 F.3d at 113-114.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)     to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)     any pertinent policy statement [issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *United States v. Crosby*, 397 F.3d at 111-13, the Second Circuit explained that, in light of *Booker*, district courts should now engage in a three-step sentencing procedure.   First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing

judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 111-12; *see also United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (post-*Booker* district courts maintain a statutory obligation to consider the Guidelines). Second, the district court should consider whether a departure from that Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to be imposed. *Id*. at 112-13; *see also United States v. Salazar*, 489 F.3d at 557 (holding, "the discretion afforded district judges by *Booker* applies to their consideration of the Guidelines range as one of the § 3553(a) factors *after* that range has been calculated") (emphasis in original). The fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error. *Id*. at 115; *see also United States v. Cuevas*, 496 F.3d 256, 265 (2d Cir. 2007) (explaining district courts have a duty "to consider the applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence").

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court explained that "[b]ecause the Guidelines are now advisory, appellate review of sentencing decisions is limited to determining whether they are 'reasonable' [citation omitted] and an abuse of discretion standard applies. . . ." *Gall*, 552 U.S. at 45. Further, a district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts of

the case." *Id.*   In so doing, the sentencing judge "must consider the extent of any departure from the Guidelines and must explain the appropriateness of any unusually lenient or harsh sentence with sufficient justifications." *Id.*

Here, the Government believes a sentence within the applicable guidelines range is appropriate in light of the seriousness of the offense, and the need for the sentence imposed to deter the defendant and others from committing similar crimes, promote respect for the law, and provide just punishment.

## A.  Seriousness of the Offense

DeJesus' offense conduct was incredibly serious because it involved the diversion and redistribution of oxycodone, one of the most dangerous drugs available on the black market today. The addictive properties of oxycodone, together with the imprimatur of legitimacy that comes from it being a prescription narcotic, have turned oxycodone into the ultimate gateway drug.   Users, particularly young ones, perceive prescription pills like oxycodone to be less dangerous than other illicit drugs.   They become addicted to the pills, run out of money to support their pill habit – which, at $1 per milligram, becomes prohibitively expensive once a person's tolerance increases– and then, more and more often, turn to heroin to keep their high and/or avoid withdrawal.   As set forth in more detail below, the opiod epidemic has reached new heights and is causing new levels of devastation not only to the users themselves, but to their families and communities.   Punishing those, like DeJesus, who have been involved in perpetuating this epidemic is incredibly important.

From 1996 to 2011, prescription opiate use showed an overall increase of 1,488%. S. Alturi, G. Sudarshan, et al., "Assessment of the trends in medical use and misuse of opiate analgesics from 2004 to 2011," *Pain Physician*, Vol. 17, 119-28 (2014).   Opiate abuse showed a

more dramatic increase of 4,680% for the same period, with the number of patients seeking treatment for prescription opiate abuse increasing 187%.   *See id*.

Recent studies demonstrate a persuasive link between prescription pill addiction and eventual heroin use.   A 2014 study of heroin users in Philadelphia and San Francisco found that young heroin users overwhelmingly had transitioned to heroin use from prescription pills – usually diverted as opposed to prescribed.   Sarah G. Mars, Philippe Bourgois et al., "Every 'Never' I Said Came True: Transitions from opiod pills to heroin injecting," *International Journal of Drug Policy*, Vol. 25, 257-266 (2014).   Virtually all of the young users (aged 20 to 29) considered themselves already opiate-dependent before they began injecting heroin.   *See id*.   These young users reported that their "introduction to opiates was facilitated by the lesser stigma and perceived lower risk of opiod pills" and, in particular, the perception that pills were "more acceptable and safer than heroin."   *See id*.   Once addicted to the pills, the users transitioned to heroin either when pills were unavailable or when they could no longer afford them.   *See id*.   As one user who was asked to explain the high incidence of heroin use in his neighborhood put it:

> Honestly, once oxycontin hit the Northeast [of Philadelphia] it was a wrap, that was it.   Once oxycontin came around and everybody started doing oxies and then when you're paying 40 dollars a pill and then you hear you can pay ten dollars for the same effect [from heroin] of course you're going to do it.

*See id*.

From the accounts of young heroin users, the authors of the 2014 study concluded:

> [S]ince the rise of the opiod pill epidemic, the barriers to heroin use and to injection have been reduced by the normalized pervasiveness of these pharmaceuticals.   The widespread availability of opiod analgesics outside of sanctioned channels and, paradoxically, medical and regulatory attempts to curb this through monitoring and limited prescribing, appear to be drawing a new generation into higher risk heroin injecting.   Unlike those substances previously labeled "gateway drugs," opiod pills

seem to have a direct relationship with progression to heroin initiation.

It is ironic that heroin, one of the few drugs entirely prohibited under US drug control laws, remains so widely available and relatively inexpensive that even those opiod-dependent users who are reluctant at first to try it are ultimately persuaded by market forces when their pill of choice becomes unavailable of unaffordable. These pill initiates for the most part did not seek out heroin, in fact many initially stigmatized heroin, but as they tried to resist each stage of their transitions, their membership of a particular generation and a historical era in specific regions put them at particular risk of transition to opiate dependence and injecting.

*See id.*

The transition to heroin from pills like oxycodone is particularly problematic given the incredible rise in heroin-related deaths.   According to the Office of Chief Medical Examiner, more than twice as many Connecticut residents died of heroin overdoses in 2015 than three years earlier.   *See* "Connecticut heroin-related deaths jumped again in 2015, report says," *New Haven Register*, Feb. 15, 2016.   There were 174 cases of heroin-related deaths in Connecticut in 2012, 258 in 2013, 327 in 2014 and 415 in 2015.   *See id.*   And heroin overdoses in 2016 appear on track to exceed the 2015 numbers.   The problem is so severe in Connecticut that, on April 13, 2016, Federal and State authorities to joined forces in an initiative to target those trafficking heroin, fentanyl or opiods that lead to deaths.   *See* "Connecticut, federal law enforcement officials team up to target opiod distributors," *New Haven Register*, Apr. 13, 2016.

In this climate, DeJesus' crime was not a victimless one.[5]   He was putting fraudulently obtained oxycodone pills into his community and helping to perpetuate the horrible pill epidemic that is, in turn, fueling the heroin epidemic that is leading to more and more deaths each year.   His

---

[5] Notably, the medical professionals whose identities were stolen by other members of the conspiracy in which Palmieri participated are identifiable victims in this case.   The State of Connecticut is also a victim, since DTO members almost always used runners who were HUSKY participants to fill the fake oxycodone prescriptions.

offense was a serious one that deserves serious punishment.

It is also important to emphasize that, in the plea agreement, the Government did not insist that DeJesus acknowledge what it believes to be his clear leadership role in the offense. DeJesus not only had multiple runners working for him, but he also was paying CW-3 to print fake prescriptions for him and was redistributing oxycodone obtained by other members of the conspiracy to his own customers, including CW-3, for a profit.   The Government could have sought a role enhancement based on these facts, but elected not to do so.   And notably, Probation has concluded based on its review of the evidence that a four-level role enhancement should apply. *See* PSR ¶ 35.

Furthermore, the Government could have sought to hold DeJesus, as a leader of the DTO, responsible for the total amount of oxycodone pills – i.e., over 80,000 oxycodone 30mg tablets – diverted by the DTO.   Instead, the Government permitted DeJesus to stipulate that a quantity of at least 15,000 oxycodone pills, but less than 50,000, were involved in DeJesus' offense.

In other words, the plea agreement does not seek to hold DeJesus accountable for the total amount of oxycodone diverted by the DTO or the extent of his involvement in the conspiratorial scheme.   In these respects, the Guideline range set forth in the plea agreement is reasonable and, if anything, is *less* punitive than the offense conduct warrants.

## B.  History and Characteristics of the Defendant

The Government does not dispute that DeJesus had a very difficult upbringing that undoubtedly affected the person he is today.   The Government does not believe, however, that the circumstances of DeJesus' upbringing warrant a departure for several reasons.

*First*, as compared to many of the defendants who appear before this Court, DeJesus is not a young defendant.   He is 38 years old and the difficult circumstances of his childhood are long behind him.   But as DeJesus has gotten older and more mature, his involvement in criminal activity has not stopped – or even slowed down.   It has continued, unabated, despite several lengthy sentences of incarceration (i.e., one sentence of 42 months to serve in 1996 and another five-year sentence in 2006).   PSR ¶¶ 54, 48.   DeJesus' continued involvement in crime following lengthy periods of incarceration suggests that he is not someone who is motivated or able to change the course of events and make a life for himself that is better than the one he experienced as a child.

*Second*, DeJesus' crimes have not been limited to narcotics-related offenses designed to feed his addiction, as his sentencing memo suggests.   His criminal record includes: (1) a 1995 conviction for reckless endangerment following officers' recovery of a loaded revolver, which had been discharged (PSR ¶ 43); (2) a 1995 conviction for possession of a pistol without a permit (PSR. ¶ 44); (3) a 2006 conviction for resisting arrest, following DeJesus' shooting a weapon at the ground and pointing the weapon at an individual's head (PSR ¶ 47); and (4) a 2006 conviction for criminal possession of a weapon, following the seizure of a loaded 9mm handgun (together with drugs and drug paraphernalia) from DeJesus' home.   DeJesus' history of illegally possessing – and using – firearms makes him a danger to the community that extends beyond his narcotics trafficking.[6]

---

[6] DeJesus states in his sentencing memo that he began "carrying a gun for protection" when he was a teenager, following the murder of a close friend.   (Doc. 414 at 3-4.)   DeJesus told Probation, however, that he was not in danger when he bought his first gun in 10th grade: "He said that he was not in danger but purchased the gun from a 'crack head' for five bags of crack."   (PSR ¶ 62.)

*Third*, the fact that DeJesus ordered violence against a cooperating witness from prison following his arrest in this case indicates that he is likely to recidivate and is not remorseful his criminal conduct in this case. Instead of sitting in prison and reflecting on the seriousness of what he did, DeJesus studied the affidavit supporting the criminal complaint against him to figure out who he could blame for his arrest. This is not conduct that warrants a departure from the advisory Guidelines range contained in the plea agreement. If anything, DeJesus' post-arrest conduct suggests that the Guidelines range set forth in the plea agreement is less severe than his behavior warrants.

### C.     Goals of Federal Sentencing:   Deterrence and the Need to Promote Respect for the Law and Provide Just Punishment

The goals of deterrence, promoting respect for the law, and the need to provide just punishment also justify a sentence within the guidelines range. The imposition of a Guidelines sentence in this case will help convey the message that illegal prescription pill trafficking will not be tolerated, and will provide just punishment to DeJesus for his role in trafficking a dangerous drug. In addition, imposition of a Guidelines sentence will hopefully achieve the goal of specifically deterring DeJesus from committing future drug crimes. DeJesus' prior, shorter prison sentences have been altogether inadequate to deter him from turning back to narcotics trafficking to support himself. Consequently, a lengthy sentence is not only appropriate in light of the severity of the conduct at issue, but necessary to deter DeJesus from repeating that conduct in the future.

***

For the reasons set forth above, a sentence within the advisory Guidelines range set forth

in the plea agreement will serve the purposes of reflecting the seriousness of the defendant's offense, provide just punishment, accomplish specific and general deterrence and protect communities from the damage that is done by drug trafficking.   The Government therefore respectfully submits that a sentence of 140 months is reasonable and no more than necessary to achieve the goals of Section 3553.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *Amy C. Brown*
AMY C. BROWN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct29771
United States Attorney's Office
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
(203) 696-3039

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2016, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ *Amy C. Brown*

_____

AMY C. BROWN
ASSISTANT U.S. ATTORNEY